AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of California



In the Matter of the Search of ⟩
*(Briefly describe the property to be searched* ⟩
*or identify the person by name and address)* ⟩    Case No.    '19 MJ ᴥ 5637
Facebook Account 100000898494103 ⟩
Target Account #2 ⟩

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-8

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-2

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❒ contraband, fruits of crime, or other items illegally possessed;

❒ property designed for use, intended for use, or used in committing a crime;

❒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 922, 924 | Felon in Possession of a Firearm/Ammunition, Possession of a Firearm |
| 21 U.S.C. 841, 846 | Possession of a Controlled Substance for Distribution, Conspiracy to Distribute a Controlled Substance |

The application is based on these facts:

See attached affidavit of FBI Special Agent Kari S. Harrison

☑ Continued on the attached sheet.

❒ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Kari S. Harrison, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 12/19/19

_____
*Judge's signature*

City and state: San Diego, CA          Hon. Michael S. Berg, United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A-8
### PROPERTY TO BE SEARCHED

Information associated with Facebook account 100000898494103, a Facebook account investigators believe to be used by Binh Nguyen with a user ID of stutter.cuz and vanity name of "Nguyen Binh" (**Target Account #2**).

Facebook, Inc. is an Internet Service Provider with its primary computer information systems and other electronic communications and storage systems, records and data located at 1601 Willow Road, Menlo Park, CA 94025.

## ATTACHMENT B-2

I.      Service of Warrant

        The officer executing the warrant shall permit Facebook, Inc., as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

II.     Items to be provided by the ISP

        All subscriber and/or user information, all electronic mail, images, text messages, histories, phone and VoIP logs, contacts or friend lists, profiles, method of payment, detailed billing records, access logs, backup data, transactional data, and any other files or records associated with the following account and screen name(s) described in the relevant **Attachment A** (i.e., **Attachment A-7, A-8, or A-9**).

III.    The search of the data supplied by the ISP pursuant to this warrant will be conducted by F.B.I. or other law enforcement agency as provided in the "Procedures For Electronically Stored Information" of the affidavit submitted in support of this search warrant and will be limited to the period of **September 4, 2019, up to and including December 5, 2019** and to the seizure of:

        a.      Communications, records, and attachments tending to discuss or establish attempts to distribute methamphetamine and other controlled substances and to possess firearms and ammunition;

        b.      Communications, records, and attachments tending to identify any co-conspirators involved in attempts to distribute methamphetamine and other controlled substances; and

//

//

//

//

c.      Communications, records, and attachments that provide context to any
        communications described above, such as electronic mail sent or
        received in temporal proximity to any relevant electronic mail and any
        electronic mail tending to identify users of the subject accounts;

**which are evidence of violations of 18 U.S.C. §§ 922(g)(1), 924(c) [Felon
in Possession of a Firearm/Ammunition; Possession of a Firearm in
Furtherance of a Drug Trafficking Offense], and 21 USC §§ 841(a)(1),
846 [Possession of a Controlled Substance for Distribution and
Conspiracy to Distribute a Controlled Substance].**

1   **AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS**

2   I, Kari S. Harrison, being duly sworn, declare and state:

3   PURPOSE OF AFFIDAVIT

4   1.    This affidavit supports an application to search the following electronic devices

5   and Facebook[1] accounts:

6
7   Blue Maze Speed cellular phone
    IMEI: Not visible
    Model Number: Not visible
8   Serial number: Not visible
    Evidence Number:  11089550
9   (**Target Device #1**)

10
11  Black Galaxy Note 3 cellular phone
    IMEI: Not Visible
12  Model Number: Not Visible
    Serial Number: Not Visible
13  Evidence Number: 11089551
    (**Target Device #2**)
14
15  Silver Samsung cellular phone
    IMEI: 359797096443799
16  Model Number: Not Visible
    Serial Number: Not Visible
17  Evidence Number: 11089551
    (**Target Device #3**)
18
19  Silver iPad
    IMEI: Not Visible
20  Model Number: A1474
    Serial Number: Not Visible
21  Evidence Number: 11089551
    (**Target Device #4**)
22

23

24  _____

25  1    Facebook, Inc., 1601 Willow Road, Menlo Park, California 94025 is an Internet
    company which, among other things, provides electronic communication services to
26  subscribers. Facebook's electronic Messenger service allows subscribers to communicate with
    other ISP subscribers through the Internet. Subscribers to Facebook use unique screen
27  names and/or email addresses during communications with others. The screen names and/or
    email addresses may or may not identify the real name of the person using a particular
28  screen name or email account.

Black LG cellular phone
IMEI: Not Visible
Model Number: Not Visible
Serial Number: Not Visible
Evidence Number: 11089608
(**Target Device #5**)

Pink iPad in a gold case covered with plastic decorations
IMEI: Not Visible
Model Number: Not Visible
Serial Number: Not Visible
Evidence Number: 11089551
(**Target Device #6**)

Facebook account 100016046019090, a Facebook account investigators believe to be used by Priscilla Ibarra with a user ID of pricilla.marie2019 and vanity name of "Priscilla Marie"
(**Target Account # 1**)

Facebook account 100000898494103, a Facebook account investigators believe to be used by Binh Nguyen with a user ID of stutter.cuz and vanity name of "Nguyen Binh"
(**Target Account #2**)

Facebook account 100015171630820, a Facebook account investigators believe to be used by Ervan Pierson with a user ID of ervin.whoop and a vanity name of "Yungwhoop YG Thagreat"
(**Target Account #3**)

as described further in Attachments A-1 through A-9, respectively, and seize evidence of crimes, specifically, 18 U.S.C. §§ 922(g)(1), 924(c), and 21 U.S.C. §§ 841(a)(1), 846 as described further in Attachments B-1, for the cellphones/iPads, and B-2, for the Facebook accounts.

2.   **Target Devices #1-5** were seized during a traffic stop and arrest of Binh Nguyen, Ervan Pierson, and Priscilla Ibarra on December 4, 2019, in the west alley of 4000 Cherokee Avenue in the city of San Diego. **Target Device #6** was seized during state search warrant #1912042028 at 4276 36th Street #8, San Diego, California, authorized by the Honorable Judge Robert Longstreth from the San Diego Superior Court on December 4th, 2019. The Target Devices are being held as evidence in the Southern District of California.

2

3.     Probable cause exists to believe that the Target Devices and Target Accounts contain evidence of Felon in Possession of a Firearm/Ammunition, Possession of a Firearm in Furtherance of a Drug Trafficking Crime, Possession of a Controlled Substance for Distribution, and Conspiracy to Distribute a Controlled Substance (the Target Offenses).

4.     All of the conclusions and beliefs set forth in this affidavit are based on my training and experience, conversations with other agents who have extensive experience in narcotics-trafficking investigations, and my knowledge of the facts of this investigation. All of the dates, times, and amounts listed in this affidavit are approximate. Conversations and discussions below are set forth in substance unless noted. Since this affidavit is for a limited purpose, I have not included every fact I know about this investigation. I set forth only facts necessary to support the issuance of the requested warrants.

TRAINING AND EXPERTISE

5.     I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7). As such, I am empowered to conduct investigations of, and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

6.     I am a Special Agent with the Federal Bureau of Investigation and have been so employed since June of 2006. I am assigned to the San Diego Field Division on the Violent Crime Task Force -Gang Group (VCTF-GG). I have received basic federal law enforcement training, including the training at the FBI Academy, as well as other specialized federal law enforcement training. I have received formal training and have experience in narcotics investigations and gang investigations, including street gang investigations. I have participated in multiple separate investigations involving the distribution of controlled substances and firearms. As part of these investigations, I have used various investigative techniques, including physical and stationary surveillance, informants and cooperating sources, court authorized interceptions, pen register/trap and trace devices, telephone toll analysis, undercover operations, physical searches, mail covers, and electronic examinations of evidence. I have monitored numerous calls and meetings with persons under investigation, including wiretap communications of drug traffickers and gang

3

1 members and associates. I have worked alongside and consulted with many law enforcement
2 officials and other professionals experienced in drug and gang investigations.

3        7.     Based on my training and experience, I am familiar with how drug traffickers
4 and gang members communicate and operate. For example, I am aware that drug traffickers
5 and gang members discuss and text criminal matters over the telephone and often use coded
6 or vague language. I am aware of how drug traffickers and gang members use their phones
7 to organize and operate their illegal activities. I am familiar with the typical make up and
8 operation of gangs and drug trafficking organizations including the distribution, storage,
9 and transportation of the drugs, the collection of money which represents the proceeds of
10 drug trafficking and other criminal activity, and money laundering

11                 FACTS AND CIRCUMSTANCES ESTABLISHING PROBABLE CAUSE

12                         *December 4th Traffic Stop*

13        8.     On December 4th at approximately 1410 hours, San Diego Police Departments
14 (SDPD) detectives were conducting surveillance at 4025 Van Dyke Avenue in the city of San
15 Diego. The investigators had previous knowledge that 4025 Van Dyke Avenue operated as
16 an illegal gambling den, where other criminal activity had occurred, including the sale of
17 methamphetamine and an attempted murder shooting. A detective drove by 4025 Van Dyke
18 Avenue and saw a group of five males loitering outside the location. It appeared there was
19 some type of disturbance with the males and someone out of view was yelling. Four of the
20 males were Asian and the fifth was a tall Black male. The detective recognized three of the
21 males to be Binh Nguyen, Quoc Huynh, and Brian Xayalounh. The detective knew all three
22 of these males to be gang members with extensive criminal histories and felony convictions.
23 Detective Tews also knew Xayalounh to be a fugitive wanted for a felony probation violation.

24        9.     Investigators attempted to set up surveillance of the group. One of the
25 investigators observed at least two of the males walk northbound and get into a black Honda
26 Accord with paper license plates. The black Honda drove away northbound then eastbound
27 onto 4200 Orange Avenue. Detectives followed the black Honda Accord and requested patrol
28 units conduct a traffic stop. As detectives were following the vehicle they observed a third

1  person sitting in the backseat and believed Xayalounh had possibly gotten into the vehicle.
2  The black Honda turned southbound onto 4100 36th Street and failed to stop at the limit
3  line of the stop sign at 36th/Polk Avenue. The Black Honda then turned southbound into the
4  west alley of 4000 Cherokee Avenue and attempted to back into a driveway. An officer in a
5  marked unit activated his overhead lights to initiate a traffic stop.

6      10.    The SDPD officer walked up to the black Honda. The male in the driver's seat
7  was Binh NGUYEN and the male in the front passenger seat was Ervan PIERSON. The
8  officer observed NGUYEN and PIERSON reaching around inside the vehicle. The officer
9  gave both subjects commands to place their hands on the dashboard. NGUYEN complied
10  but PIERSON continued to reach deeply under his buttocks and around his back. PIERSON
11  was wearing a large baggy jacket, baggy jeans, and had a fanny pack on his lap. The officer
12  pointed his handgun at both subjects and continued to give verbal commands. PIERSON
13  continued moving his hands while at gunpoint.

14      11.    Officers arrived to assist. Based upon PIERSON's behavior the officers
15  attempted to handcuff and remove PIERSON for a pat down for weapons. PIERSON made
16  a statement to the effect of, "it's falling out" as the officers attempted to remove him from
17  the vehicle. Once PIERSON was handcuffed, officers saw a black semi-automatic handgun
18  with a white grip lying on the passenger seat where PIERSON had been sitting. The
19  handgun was a Glock .40 caliber loaded with a round in the chamber. Officer also observed
20  a black semi-automatic handgun lying on the driver side floorboard where NGUYEN was
21  seated. The handgun was a Smith and Wesson 9mm caliber and had a round loaded into the
22  chamber. NGUYEN was taken into custody.

23                        *Seizure of Target Devices #1 - #5*

24      12.    An officer retrieved the fanny pack that fell to the ground from PIERSON's lap.
25  Inside the fanny pack there was a silver Samsung cellular phone (**Target Device #3**), a
26  black Galaxy Note 3 cellular phone (**Target Device #2**), and a silver iPad (**Target Device
27  #4**). All three of these items were impounded at the SDPD Property Room.

28

1      13.    A records check confirmed NGUYEN and PIERSON had previous felony
2    convictions. PIERSON also had a CDC parole violation warrant for his arrest. NGUYEN
3    and PIERSON were placed under arrest for prohibited person in possession of a firearm. An
4    officer searched NGUYEN and recovered a blue Maze Speed cellular phone (**Target Device**
5    **#1**) from his pants pocket. This cellular phone was impounded at the SDPD Property Room.

6      14.    The Smith & Wesson, 9mm semi-automatic handgun, bearing serial number
7    FZC8296 was inspected. Preliminary checks revealed that the firearm was not
8    manufactured in California. The four rounds of Smith & Wesson, .40 caliber ammunition
9    from the firearm with the white grip were inspected. Preliminary checks revealed that the
10   ammunition was not manufactured in California. The firearm with the white grip was
11   inspected and found to have a homemade lower.

12     15.    An officer spoke to Priscilla IBARRA, who was standing at the gate of the
13   driveway near the Black Honda. IBARRA told officers she had been sitting in the backseat
14   of the Black Honda with NGUYEN and exited to open the gate. Investigators found a black
15   LG brand cellular phone (**Target Device #5**) depicting a photo of Ibarra holding a small
16   child on the home screen. **Target Device #5** was impounded at the SDPD Property Room.
17   There was a black bag next to the phone. An investigator opened the bag and found a Ziploc
18   bag containing a large amount of a white crystalline substance, which contained
19   approximately half a pound of methamphetamine. All three subjects were transported for
20   processing and interviews.

21     16.    Pierson was *Mirandized* and agreed to speak with detectives. Pierson
22   denied any knowledge of methamphetamine in the vehicle and denied possession of the
23   firearm but said his DNA might be on the firearm with the white grip and acknowledging
24   knowing the firearm was in the car, saying he "looked at that mother fucker a couple of
25   times."

26     17.    IBARRA was *Mirandized* and agreed to speak with detectives. IBARRA
27   stated she was at NGUYEN's apartment on 36th Street near El Cajon Boulevard prior to
28   the stop. IBARRA was inside with NGUYEN and PIERSON. IBARRA said PIERSON

1 | told her to grab a bag from inside the apartment and bring it with. IBARRA peeked
2 | inside the bag and saw it contained ½ pound of methamphetamine.

3 | 18.    IBARRA described where NGUYEN's apartment was on 36th Street.
4 | IBARRA then changed her story and stated she stole the half pound of "meth" from a
5 | different person in Paradise Hills. IBARRA began to cry and stated she and NGUYEN
6 | are in a dating relationship. IBARRA said NGUYEN does not sell methamphetamine
7 | and "gives it away." IBARRA said NGUYEN and PIERSON both knew the drugs were
8 | in the backseat because she was carrying it.

9 | 19.    During the interview, detectives discussed IBARRA's phone with her.
10 | IBARRA told the detective there would be messages where people were "hitting her up
11 | for dope." IBARRA gave detectives consent and they were able to review the contents of
12 | her phone.

13 | *Search of NGUYEN's Apartment and Seizure of Target Device #6*

14 | 20.    Detectives obtained a state search warrant to search 4276 36th Street #8 for
15 | evidence of firearms, methamphetamine, transfer and sales of methamphetamine, and
16 | to seize all cellular phones. At approximately 2130 hours, SDPD officers and detectives
17 | went to 4276 36th Street #8 to serve the search warrant. Officers used a key from
18 | NGUYEN's key chain to open the door. No one was inside.

19 | 21.    Investigators searched the bedroom of the one bedroom apartment. Inside
20 | the bedroom there were documents and mail bearing the name "Binh Nguyen," along
21 | with clothing. Investigators located a bag of methamphetamine on the dresser containing
22 | approximately three grams of methamphetamine and approximately two dozen small
23 | empty plastic baggies. In the top right drawer, investigators found an operable digital
24 | scale with a crystalline residue on it. Investigators located an apparent bullet impact on
25 | the bedroom floor and an expended 9mm shell casing. Investigators also located and
26 | seized a pink iPad in a gold case covered with various plastic decorations **(Target**
27 | **Device #6)**. The iPad was impounded at the SDPD Property room.

28 | //

*Identification of Target Accounts #1 -#3*

22.   On December 9, 2019, a detective spoke to Gary Nguyen via telephone, no familiar relation to NGUYEN, NGUYEN was dating Gary Nguyen's daughter prior to her death last month. Gary Nguyen stated the gold iPad recovered from the bedroom at 4276 36th Street #8 belonged to him. Gary Nguyen provided the passcode to unlock the iPad to verify ownership of the device. The detective was able to unlocked the iPad with the password he provided and noticed a Facebook account named "Yungwhoop YG Thagreat" was open on the screen. The Facebook profile picture was a photograph of PIERSON. The most recent photographs on the iPad were pictures of PIERSON, IBARRA, and one of NGUYEN.

23.   During the interview conducted with SDPD Detectives, IBARRA provided her Facebook account user ID was **"Priscilla Marie"** (**Target Account-1**). IBARRA's Facebook messenger account was open on her phone which she showed detectives. During the interview IBARRA directed detectives to the Facebook accounts for NGUYEN (**Target Account-2**) and PIERSON (**Target Account-3**).

24.   **Target Account-1** appears to have a limited number of items that were publicly-available. These items include photos of an individual that investigators recognized as IBARRA. **Target Account-1**'s vanity name is "Priscilla Marie."

25.   **Target Account-2** appears to have a limited number of items that were publicly-available. These items include photos of an individual that investigators recognized as NGUYEN. **Target Account-2**'s vanity name is "Nguyen Binh," which is NGUYEN's name reversed.

26.   **Target Account-3** appears to have a number of items that were publicly-available. These items include photos of an individual that investigators recognized as PIERSON. **Target Account-3**'s vanity name is "Yungwhoop YG Thagreat," and investigators learned that PIERSON is sometimes known as "YG."

//

//

8

BASIS FOR EVIDENCE SOUGHT IN SEARCH WARRANT

27.    Based upon my training and experience, and consultations with law enforcement officers experienced in drug trafficking and money laundering investigations, and all the facts and opinions set forth in the affidavit, I submit the following:

a.    Drug traffickers use cellular telephones and other electronic devices with internet access because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

b.    Drug traffickers believe that cellular telephones and other electronic devices with internet access provide greater insulation and protection against court-ordered wiretaps, and they believe in the inability of law enforcement personnel to simultaneously track the originating and destination telephone numbers of calls placed to and from their cellular telephones.

c.    Drug traffickers use cellular telephones and other electronic devices with internet access because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

d.    Drug traffickers and their accomplices use cellular telephones and other electronic devices with internet access because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

e.    Drug traffickers use cellular telephones and other electronic devices with internet access to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

f.    Drug traffickers use cellular telephones and other electronic devices with internet access to notify or warn their accomplices of law enforcement activity to include the presence and posture of U.S. and foreign law enforcement agents.

g.    Drug traffickers are aware that the use of their cellular phones in furtherance of their criminal activities creates several types of cellular-phone-related evidence. (This evidence may include call-logs, incoming and outgoing messages, geo-location data, photographs, and contact lists.) As a result, drug-traffickers and money-

1  laundering facilitators who anticipate that their cellular phones will be searched by law
2  enforcement often attempt to delete all existing data on their cellular phones in order to
3  destroy evidence and evade law enforcement scrutiny.

4         g.     Drug traffickers use social media to communicate with co-conspirators,
5  post activity related to narcotics movement and sales, show photos of money earned from
6  narcotics sales and post photos of narcotics activities.

7         h.     Individuals possessing weapons very often photograph and create videos
8  of themselves with the weapons using their cellular telephones and post them on social
9  media accounts. Additionally, these individuals will communicate via text regarding the
10  weapons they have for sale or use or to purchase other weapons.

11                                            FACEBOOK, INC.

12       28.     Facebook owns and operates a free-access social networking website of the
13  same name that can be accessed at http://www.facebook.com. Facebook allows its users to
14  establish accounts with Facebook, and users can then use their accounts to share written
15  news, photographs, videos, and other information with other Facebook users, and
16  sometimes with the general public.

17       29.     Facebook asks users to provide basic contact and personal identifying
18  information to Facebook, either during the registration process or thereafter. This
19  information may include the user's full name, birth date, gender, contact e-mail addresses,
20  Facebook passwords, Facebook security questions and answers (for password retrieval),
21  physical address (including city, state, and zip code), telephone numbers, screen names,
22  websites, and other personal identifiers. Facebook also assigns a user identification number
23  to each account.

24       30.     Facebook users may join one or more groups or networks to connect and
25  interact with other users who are members of the same group or network. A Facebook user
26  can also connect directly with individual Facebook users by sending each user a "Friend
27  Request." If the recipient of a "Friend Request" accepts the request, then the two users will
28  become "Friends" for purposes of Facebook and can exchange communications or view

information about each other.   Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

31.   Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

32.   Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.   A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

33.   Facebook has a Photos application, where users can upload an unlimited number of albums and photos. Another feature of the Photos application is the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.   For Facebook's purposes, a user's "Photoprint" includes all photos uploaded by that user that have not been deleted, as well as all photos uploaded by any user that have that user tagged in them.

11

34. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

35. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

36. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

37. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

38. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

39. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

40. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a

12

personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

41.    Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

42.    In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

43.    Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

44.    Facebook also retains Internet Protocol (IP) logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

45.    Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).

13

In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

46.     Facebook tracks location data for mobile users. The Facebook app has access to a user's location data even when the user is not using the Facebook app.

47.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

PROCEDURES FOR ELECTRONICALLY STORED INFORMATION
ELECTRONIC DEVICES

48.     It is not possible to determine, merely by knowing an electronic devices' make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Electronic devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many electronic devices like cellular telephones and iPads do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using

14

forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive. However, although manual review and digital photograph may be necessary, it is impractical because of the volume of data that may exist on a cellular phone and the manner in which that data may be displayed. For instance, manual review may require hundreds or even thousands of photographs to capture a conversation with a single other person.

49.     Further, forensic data acquisition may allow for the recovery of data that is not visible to an agent manually reviewing the contents of an electronic device. For instance, in some instances, forensic data acquisition involves creating an image of the entirety of the phone's/iPad's memory, including "unallocated" areas where deleted information may be stored. If unallocated space is successfully imaged, forensic reviewers may be able to access data that had previously been deleted. In those cases, deleted data recovered through forensic analysis would not be visible to an individual manually reviewing the contents of the phone, and therefore, could not be photographed during a manual review.

50.     A cellular phone/iPad that is subject to forensic data acquisition can generally be returned to its user once data has been extracted without any indication that data has been extracted. Similarly, a phone/iPad that is not subject to forensic data acquisition can generally be manually reviewed returned to its user without any indication that it has been manually reviewed.

51.     Following the issuance of this warrant, I will collect the **Target Devices #1-#6** and subject the devices to analysis. All forensic analysis of the data contained within the device and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

52.     A review of forensically extracted data or digital photographs taken during the manual review process for items subject to seizure may take weeks or months. The

personnel conducting the analysis of that data will complete their analysis within ninety (90) days, absent further application to this court.

PROCEDURES FOR ELECTRONICALLY STORED INFORMATION
FACEBOOK ACCOUNTS

53. Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Facebook, Inc. (hereinafter "the internet service provider" or "the ISP") are not. It would be inappropriate and impractical for federal agents to search the vast computer network of the ISP for the relevant accounts and then to analyze the contents of those accounts on the premises of the ISP. The impact on the ISP's business would be disruptive and severe.

54. Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored videos, photographs, and any other content from the Facebook accounts, as described in **Attachment B-2**. In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of the ISP, to protect the privacy of the ISP's subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, the Federal Bureau of Investigation seeks authorization to allow the ISP to make digital copies of the entire contents of the accounts subject to seizure. The copies will be provided to me or to any authorized federal agent. The copies will be imaged and the images will then be analyzed to identify communications and other electronic records subject to seizure pursuant to **Attachment B-2**. Relevant electronic records will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

55. Analyzing the data to be provided by the ISP may require special technical skills, equipment, and software. It may also be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Keyword

16

searches do not capture misspelled words, reveal the use of coded language, or account for slang. Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text. Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically. The ISP do not always organize the electronic files they provide chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

56.    Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by the ISP, examiners may need to review each record to determine if it is responsive to **Attachment B-2**. The personnel conducting the examination will complete the analysis within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

57.    Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic mails that identify any users of the subject accounts and any electronic mails sent or received in temporal proximity to incriminating electronic mails that provide context to the incriminating mails.

58.    All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

GENUINE RISK OF DESTRUCTION OF DATA

59.    Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be

17

1  permanently deleted or modified by users possessing basic computer skills.  In this case,
2  preservation letters were sent to Facebook in anticipation of this application for search
3  warrants.

4                                    PRIOR ATTEMPTS TO OBTAIN DATA

5          60.    The United States has not attempted to obtain this data by other means other
6  than the limited viewing of publically accessible content as described above.

7                                        SERVICE ON FACEBOOK

8          61.    Because the warrant will be served on Facebook, who will then compile the
9  requested records, there is reasonable cause to permit the execution of the requested
10  warrant at any time in the day or night.  Pursuant to Title 18 United States Code Section
11  2703(g), the presence of a law enforcement officer is not required for the service or
12  execution of this warrant.

13

14                                             CONCLUSION

15         62.    Based on all the facts and circumstances described above, I believe that
16  probable cause exists to conclude that NGUYEN used the **Target Devices #1 and #6 and**
17  **Target Account #2,** PIERSON used **Target Devices #2, #3, #4, and #6 and Target**
18  **Account #3,** and IBARRA used **Target Devices #5 and #6 and Target Account #1** to
19  facilitate the Target Offenses. The **Target Devices #1-#6** were likely used to facilitate the
20  offenses by transmitting and storing data, which constitutes evidences of violations of the
21  Target Offenses. I also believe that probable cause exists to believe that evidence of illegal
22  activities continues to exist on the **Target Devices** as well as **Target Accounts.**
23  //
24  //
25  //
26  //
27  //
28

                                                  18

63.     Therefore, I respectfully request that the Court issue a warrant authorizing me, or another federal law enforcement agent specially trained in digital evidence recovery, to search the items described in Attachments A-1 through A-9, and seize the items listed in Attachments B-1, for the cellphones/iPads, and B-2, for the Facebook accounts. I declare under penalty and perjury the foregoing is true and correct to the best of my knowledge and belief.

Kari S. Harrison
FBI Special Agent

Subscribed and sworn to before me this 18th day of December, 2019.

The Honorable Michael S. Berg
United States Magistrate Judge

19